Lawrence P. Eagel
David J. Stone
BRAGAR EAGEL & SQUIRE, P.C.
885 Third Avenue, Suite 3040
New York, NY 10022
Tel: (212) 308-5858

*Co-Special Litigation Counsel for Plaintiff*
*Additional Counsel Identified on Signature Page*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:

HHH CHOICES HEALTH PLAN, LLC, *et al.,*

                       Debtors.

Chapter 11

Case No. 15-11158-MEW
Case No. 15-13264
Case No. 16-10028

(Jointly Administered)

-----------------------------------------------------------------x

SEAN SOUTHARD, as PLAN ADMINISTRATOR
of the AMENDED CHAPTER 11 PLAN OF
LIQUIDATION FOR *HEBREW HOSPITAL SENIOR
HOUSING, INC.*,

                       Plaintiff,

               v.

MARY FRANCES BARRETT, BRIAN PERINO,
PETER SANNA, PETER CUTAIA, ALAN PEARCE,
CHARLES GOLDBERGER, MICHAEL LAUB,
MARVIN LIFSON, DONNA JAKUBOVITZ,
EDWARD SCHECTER, LEON SILVERMAN,
and DAVID KERSHNER,

                       Defendants.

Adversary Proceeding No.
17-01240-MEW

-----------------------------------------------------------------x

### <u>THIRD AMENDED AND SUPPLEMENTAL ADVERSARY COMPLAINT</u>

Plaintiff, Sean Southard, as Plan Administrator of the Amended Chapter 11 Plan of

Liquidation for *Hebrew Hospital Senior Housing, Inc.* (hereafter the "Plan Administrator"), on

behalf of Hebrew Hospital Senior Housing, Inc. (hereafter "HHSH" or the "Debtor"), by and through undersigned counsel, alleges, upon information and belief, based upon the investigation of counsel, as follows:

## Overview of the Action

1. The Plan Administrator seeks to recover the significant damages caused by former officers and directors of the Debtor, Mary Frances Barrett, Brian Perino, Peter Sanna, Peter Cutaia, Alan Pearce, Charles Goldberger, Michael Laub, Marvin Lifson, Donna Jakubovitz, Edward Schecter, Leon Silverman, and David Kershner (sometimes hereafter collectively the "Defendants") arising from their breaches of multiple legal duties, including those of loyalty, good faith, and care, as a direct result of the Defendants' gross mismanagement of the Debtor's financial affairs and failure to comply with applicable laws and regulations. The claims asserted by the Plan Administrator include the claims and causes of action of the Debtor and those of current and former residents who have assigned their respective, individual claims to the Plan Administrator.

2. As more fully alleged herein, at all relevant times, the Debtor was insolvent from a balance sheet standpoint and in violation of multiple provisions of New York law regulating its operations. By no later than the fiscal year ended December 31, 2011, the Debtor received a "going concern" opinion from its accountants, and it continued to receive going concern opinions annually until it filed for relief under Chapter 11 of the United States Bankruptcy Code in December 2016.

3. Despite the Debtor's obvious and fundamental financial problems, all of which were well known to Defendants, Defendants took no meaningful steps to alter the Debtor's flawed business model or to pursue meaningful reform of the Debtor's financial structure or operations. Defendants knowingly caused the Debtor to operate in violation of New York law. Those statutory violations ultimately ensured the Debtor's failure, with significant losses to Debtor. Further,

2

Defendants' breaches resulted in significant losses to the elderly residents the Debtor was supposed to serve. For years after Debtor became insolvent and failed to maintain reserves required by New York law, Defendants continued to market the Debtor's residential facility to unsuspecting potential residents without making legally required financial disclosures. Further, although Defendants owed fiduciary duties to the Debtor's residents, the Defendants hid from them the Debtor's dire and declining financial condition.

4.      The Debtor, a not-for profit corporation, was the owner and operator of a living facility for the elderly known as a continuing care retirement community ("CCRC"). The Debtor's facility was named Westchester Meadows and was located in Westchester County, New York. Westchester Meadows offered one hundred twenty (120) independent living units, ten (10) enriched housing units, and a twenty (20)-bed skilled nursing facility.

5.      To become a resident of Westchester Meadows, applicants were required to pay an entrance fee of several hundred thousand to nearly a million dollars and to pay significant monthly fees thereafter. An important financial incentive to many new residents was the Debtor's written promise that a large percentage of the entrance fee paid by, or on behalf of, new residents, was refundable when the resident either moved out or passed away. With the understanding that a large part of the entrance fee would be paid to the resident or their heirs, residents could enjoy the benefits of living in a community offering both independent, assisted living facilities and more traditional nursing home care.

6.      In marketing Westchester Meadows, the Officer Defendants touted that the large, refundable entrance fee represented a secure, long-term investment that would benefit the residents' heirs. As one version of the marketing materials stated: "Life Care will maximize asset preservation and ensure your estate won't be depleted, . . . choosing Life Care is one of the smartest

choices you can make. You're ensuring the financial legacy you've worked so hard for is preserved . . . ." But Defendants knew that rather than "ensure" a resident's estate, there was a substantial risk (ultimately realized) that the Debtor would default on its obligations to refund residents' entrance fees. Indeed, at the very time residents were assured that their financial legacies would be preserved, the Debtor was insolvent, had received multiple going concern opinions from its auditors, and was in serious violation of its statutory obligations to maintain adequate reserves to repay entrance fees and other debts.

7. New York State has enacted a comprehensive statutory and regulatory framework for CCRCs that ensures potential residents are provided comprehensive disclosure as to both the services provided by a CCRC and its financial condition, ensures the financial health of the CCRC, and ensures the CCRC will honor its financial obligations to its residents. To that end, Defendants were required to provide detailed disclosures to potential residents, including audited financial statements and other information pertaining to the financial health of the CCRC. Further, each CCRC is required to maintain a specified level liquid reserves to ensure that entrance fees can be repaid as promised and that the CCRC honors its other financial obligations.

8. As detailed below, under the Defendants' stewardship, the Debtor has been in serious and continuous violation of its statutory and regulatory obligations from at least 2007 through the date it filed for relief under Chapter 11 of the United States Bankruptcy Code. The Debtor's reserves were continuously deficient under New York law. Further, under Defendants' stewardship, the Debtor routinely failed to make the required disclosures to potential residents prior the residents' execution of contracts or transfer of money, as required by law. In particular, Defendants caused the Debtor to fail to provide audited financial statements and to fail to disclose the Debtor's receipt of multiple going concern opinions and its inadequate statutorily required

reserves. Further, Defendants distributed disclosure statements to prospective residents that gave a false impression that Westchester Meadows was complying with state regulations concerning financial reserves.

9.     The Debtor's multiple claims, demands, and causes of action against the former officers and directors were transferred to the Plan Administrator by the Amended Plan of Liquidation and Order of Confirmation (the "Confirmation Order") of such Plan. Subsequent to entry of the Confirmation Order, the Plan Administrator received assignments of claims from seventy-nine (79) current residents, former residents, or their heirs or representatives (collectively, the "Assignors"). A list of the Assignors is attached as Exhibit A; a specimen assignment is attached as Exhibit B.

10.     Each of the Assignors assigned to the Plan Administrator

> [A]ny and all claims, demands, causes of action, class in action, and other obligations of any type or description whether known or unknown, liquidated or unliquidated, asserted or unasserted, whether arising in tort, contract or other basis or theory, which the undersigned has or may have against any and all persons who have at any time (i) acted, served or been employed as an officer, director, employee or consultant of HHSH or the Facility; (ii) acted as consultants, independent contractors, advisors, or other professionals who provided services to HHSH or the Facility; or (iii) any parties to a contract, agreement or understanding with the undersigned relating to HHSH or the Facility.

By this action, the Plan Administrator asserts all of the claims, demands, and causes of action assigned to him by the Assignors.

11.     New York law provides that directors and officers of not-for-profit corporations must "discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." Defendants failed to meet their duties to the Debtor and the senior citizens who chose Westchester Meadows as their home. Any reasonably prudent person would have known the Debtor could not continue in

operation without a radical restructuring of its failed business model. Any reasonably prudent person would have recognized that the Debtor could not continue to operate when insolvent and in violation of its statutory obligations. Any reasonably prudent person would have recognized that the Debtor could not violate its obligations to make full and complete disclosures to potential residents and those who actually chose to live at Westchester Meadows. But Defendants never sought to redesign Debtor's failed business model. Similarly, Defendants never made any meaningful effort to restructure the Debtor or to cure its continuing and pervasive statutory and regulatory violations.

12. Prior to the filing of this Adversary Proceeding, the Debtor was unable to assert the claims alleged herein. The Debtor was at all times under the direction and control of Defendants, and, as a not-for-profit corporation, Debtor had no shareholders. At all times the Debtor was controlled by the Defendants, many of whom retained their respective positions until shortly before the Debtor's Chapter 11 filing and several retained their positions after the filing. The Defendants were the Debtor's fiduciaries from the time they were appointed as officers and directors through the date they left those positions. The Debtor relied on Defendants throughout their periods of service to acquit their fiduciary duties and trusted that they would continue to exercise those duties in good faith and using the care that an ordinarily prudent person in a like position would exercise under similar circumstances. Now that Defendants are no longer serving in those fiduciary roles, the Plan Administrator brings this action to recover for the damages the Debtor and Assignors suffered due to Defendants' breaches of their duties of care, good faith, and loyalty.

13. As a result of the Debtor's insolvency and pervasive violations of its statutory and regulatory obligations, the Debtor ultimately defaulted on its obligations to repay millions of dollars of entrance fees to former residents and was required to seek relief under Chapter 11 of the

Bankruptcy Code. The Debtor was unable to reorganize as an operating entity; the Westchester Meadows facility has been sold and the Debtor has no continuing business operations. At this time, the Debtor has no assets with which to pay the tens of millions of dollars of current and future obligations owed to creditors and former residents. The Debtor's catastrophic financial condition is largely attributable to Defendants' failure to discharge properly their duties of care, good faith, and loyalty, and the Plan Administrator is entitled to a judgment awarding damages caused by Defendants' acts and omissions to Debtor's estate for the benefit of its unsecured creditors and Assignors.

**<u>Jurisdiction and Venue</u>**

14.     The Debtor filed a Voluntary Petition for Reorganization under Chapter 11 of the United States Bankruptcy Code on December 9, 2015 (the "Petition Date"), and it was appointed a debtor-in-possession authorized to administer its estate in reorganization.  Westchester Meadows has been sold pursuant to an order of this Court, and the Debtor has no active business operations as of this date.

15.     This is an Adversary Proceeding within the meaning of Rule 7001 of the Federal Rules of Bankruptcy Procedure. It is a non-core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

16.     This Adversary Proceeding is closely related to the pending Chapter 11 case of the Debtor. Accordingly, it falls within the District Court's jurisdiction under 28 U.S.C. § 1334. It further falls under the scope of proceedings referred to this Court by the standing order of reference entered by the United States District Court for the Southern District of New York.

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because this Adversary Proceeding arises out of and relates to the above-captioned jointly administered Chapter 11 cases, and those cases were filed and remain pending in this judicial district.

## Parties

18.     Plaintiff Plan Administrator brings this action on behalf of the Debtor's estate pursuant to the Findings of Fact, Conclusions of Law, and Order Confirming Amended Chapter 11 Plan of Liquidation for Hebrew Hospital Senior Housing, Inc., entered August 1, 2018 [docket No. 918] and the Amended Chapter 11 Plan of Liquidation of Hebrew Hospital Senior Housing, Inc. [docket 884], appointing Sean Southard as Plan Administrator and authorizing the Plan Administrator to substitute as plaintiff in this action.  The Plan Administrator also brings this action as the assignee of the individual and personal claims of the Assignors.

19.     Defendant Mary Frances Barrett is, upon information and belief, a person of the age of majority and a resident of the State of New York. Ms. Barrett was at all relevant times the Chief Executive Officer of the Debtor. In October 2014, Ms. Barrett became a director of the Debtor and was appointed President of the Board. Ms. Barrett was paid a salary that far exceeded comparable salaries for chief executives of non-profit corporations engaged in activities and owning and operating facilities similar to those of the Debtor.

20.     Defendant Brian Perino is, upon information and belief, a person of the age of majority and a resident of the State of New York. Mr. Perino was Chief Financial Officer of the Debtor at all relevant times until his retirement in approximately October, 2014. Mr. Perino, like Ms. Barrett, was paid a salary substantially greater than typical of chief financial officers of non-profit corporations engaged in activities and owning and operating facilities similar to those of the Debtor.

21.     Defendant Peter Sanna is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Mr. Sanna was the Executive Director of Westchester Meadows.

22.     Defendant Peter Cutaia is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Mr. Cutaia was a member of the Debtor's senior management. Commencing in or around October 2014, Mr. Cutaia became the Chief Financial Officer, Treasurer, and Secretary of the Debtor.

23.     Defendant Alan Pearce is, upon information and belief, a person of the age of majority and a resident of the State of Connecticut. At all relevant times, Mr. Pearce was a director of the Debtor. He also served as the Secretary of the Debtor. As of 2012, Mr. Pearce was appointed Vice Chairman of the Debtor; he became Chairman in June 2013 and remained in that position through the Petition Date. Mr. Pearce is a member of the law firm of Bryan Cave, LLP, which provided services to the Debtor and certain of its affiliates and received significant fees from the Debtor and/or its affiliates. Mr. Pearce benefited personally from those fees and expenses.

24.     Defendant Charles Goldberger is, upon information and belief, a person of the age of majority and a resident of the State of New York. Mr. Goldberger was, at all relevant times, a Director of Westchester Meadows. Mr. Goldberger was President of the Board of Directors until October 2014. During all relevant time periods, Goldberger was a member of the firm McCullough, Goldberger and Staudt, LLP. That law firm served as de facto general counsel for the Debtor and was paid significant fees and expenses by the Debtor. Those fees and expenses benefited Mr. Goldberger personally.

25.     Defendant Michael Laub is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Mr. Laub was a Director

of the Debtor. In 2012, Mr. Laub was appointed Secretary and Treasurer of the Board of Directors of the Debtor; he held that post until October 2014.

26.     Defendant Marvin Lifson is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Mr. Lifson was a Director of the Debtor.

27.     Defendant Donna Jakubovitz is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Ms. Jakubovitz was a Director of the Debtor.

28.     Defendant Edward Schecter is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Mr. Schecter was a Director of the Debtor.

29.     Defendant Leon Silverman is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Mr. Silverman was a Director of the Debtor.

30.     Defendant David Kershner is, upon information and belief, a person of the age of majority and a resident of the State of New York. At all relevant times, Mr. Kershner was a Director of the Debtor.

31.     Defendants Barrett, Lifson, Jakubovitz, Pearce, Goldberger, Laub, Schecter, Silverman, and Kershner are hereafter sometimes referred to collectively as the "Director Defendants." Defendants Barrett, Perino, Sanna and Cutaia are hereafter sometimes referred to collectively as the "Officer Defendants."

**Factual Allegations Relevant to All Counts**

**A. Relevant Statutory Protections**

32.     Continuing Care Retirement Communities ("CCRCs") are a product of statutes adopted by the State of New York and are subject to pervasive regulation. Article 46 of the New York State Public Health Law specifically addresses CCRCs. It imposes multiple requirements on CCRCs and provides remedies for violations of those requirements. The New York legislature adopted Article 46 to "ensure that the financial, consumer and healthcare interests of individuals who enroll [in a CCRC] will be protected" through effective management and careful oversight. N.Y. Pub. Health Law § 4600 (legislative findings and purpose).

33.     Among other protections, New York law requires CCRCs to submit actuarial studies to the Department of Financial Services (sometimes hereinafter the "DFS"). 11 CRR-NY 250.9. Each CCRC is required to maintain sufficient financial reserves for past and future liabilities, including payment of entrance fee refunds. 11 CRR-NY 350.2 and 350.3. If a CCRC does not have a satisfactory actuarial balance, the CCRC must prepare and submit to the DFS a plan to achieve satisfactory actuarial balance. 11 CRR-NY 350.8(a). If the plan is rejected and there is not a satisfactory actuarial balance change in seven years, the CCRC shall be deemed insolvent.

34.     Article 46 also seeks to ensure that persons considering purchasing an interest in a CCRC are provided comprehensive information with respect to both services provided by the CCRC and its financial health. Potential residents are to be provided with a disclosure statement containing detailed information with respect to services provided, the operator, and the facility. Further, each potential resident is to be provided with detailed financial information including,

without limitation, the audited financial statement of the CCRC for its most recent fiscal year. N.Y. Pub. Health Law § 4606.

35.     Of particular relevance to this Adversary Proceeding are a number of statutory provisions imposed upon CCRCs that the Debtor routinely violated. These include the following:

(i)     The operator of the CCRC shall at all times maintain liquid assets sufficient to pay:

      a.     principal and interest payments and payments for taxes and insurance for up to twelve months;

      b.     total estimated operating costs for up to six months;

      c.     repair and replacements costs for up to twelve months;

      d.     any cash flow requirements and conditions set forth in regulations established by the CFS; and

      e.     estimated future capital operating and refund expenses including entrance fee refunds due to residents. N.Y. Pub. Health Law § 4611 (emphasis added).

(ii)    The operator of a CCRC shall provide applicants and residents with the CCRC's most recent annual financial statement. That statement must contain, at a minimum, an audited financial statement; an accountant's opinion; a balance sheet; a statement of income and expense; a statement of equity or fund balances; a statement of changes in financial position; notes to the financial statement "considered customary and necessary to ensure full disclosure of the financial statements, financial conditions and operations;" a detailed listing of the assets maintained in the reserve; and a copy of the most recent actuarial review of the community "including an opinion of a qualified consulting actuarial as to the current and

projected soundness of the community." N.Y. Pub. Health Law § 4607. (The audited financial statement and related materials are sometimes hereafter referred to collectively as the "Financial Disclosures").

(iii)    The operator must prepare and deliver to each potential resident a disclosure statement which shall include extensive information concerning the operator of the CCRC, the services provided, the facility, and affiliations of the operator/owner. N.Y. Pub. Health Law § 4606.

(iv)    Neither the operator nor anyone acting on its behalf shall provide to any potential resident a disclosure statement, Financial Disclosures, or other writing which is deceptive, untrue, misleading, or omits material facts. N.Y. Pub. Health Law § 4618.

(v)    Any person (including the operator of the CCRC or any person acting on its behalf) who either fails to provide a potential resident with the required disclosure statement or Financial Disclosures or provides a disclosure statement or Financial Disclosures which are misleading, deceptive, or omit material information, shall be liable to the resident for damages and repayment of all interest, application charge, entrance fees, or other fees paid by such person, together with interest, cost and reasonable attorney's fees. N.Y. Pub. Health Law § 4618.

(vi)    Any person who knowingly uses or employs any practice in violation of Article 46, including failure to provide the required disclosures, "shall be guilty of a Class A Misdemeanor." N.Y. Pub. Health Law § 4619.

**B. The Debtor's Insolvency and Failure to Meet and Maintain Required Reserves**

36.     The Debtor opened Westchester Meadows to residents on April 29, 2002. In the years that followed, the Debtor's expenses routinely exceeded its revenue. Between January 1, 2002, and December 31, 2006, the Debtor experienced a net loss exceeding $14 million dollars. As a result of these net losses, the Debtor also failed to meet and maintain the reserves required by New York law.

37.     A report prepared by the State of New York Insurance Department and released on October 9, 2007, confirmed the Debtor's operating losses, noted the Debtor's insolvency, and concluded that "[a]s of December 31, 2006, the Community's required actuarial surplus, as determined by using generally accepted actuarial standards and applying statutory requirements, was impaired in the amount of $7,116,399."

38.     Notably, Director Defendants Goldberger, Laub, and Pearce served on the Board at the time the Department of Insurance's 2007 report was issued and were provided with a copy of that report. As of the date of the report, the Debtor employed Officer Defendants Barrett and Perino, respectively, as President and Chief Executive Officer and Chief Financial Officer. Each received a copy of the report. The significant deficiencies identified by the report were never corrected and remained deficiencies as of the Petition Date.

39.     Upon information and belief, persons to whom Defendants marketed Westchester Meadows, persons who applied for residency there, and those who become residents were not provided with the report of the Department of Insurance or subsequent report of the Department of Insurance that also concluded that the Debtor was insolvent and had grossly deficient reserves. Similarly, those persons were never made aware of the existence of the reports or its conclusions as to the Debtor's financial condition.

40.     As of the date of the Department of Insurance's 2007 report, the Debtor was subject to an approved Plan of Restoration between the Debtor and the Department of Insurance, which was intended to resolve the deficiency in reserves and "restore its minimum surplus as required by Department Regulation." The Plan of Restoration was premised on the projection that the Debtor would significantly increase its occupancy rate and certain fees and reduce operating expenses.

41.     As of this date, the Plan Administrator is not aware of whether the Director Defendants and Officer Defendants caused any part of the Plan of Restoration to be implemented. It is certain, however, that the Debtor neither became profitable, sufficiently increased its occupancy rates, nor met its reserve requirements.

42.     A report on examination prepared by DFS for the period of January 1, 2009, through December 31, 2010, observed that the Debtor had recognized a net operating loss of $4,874,356. The Debtor remained insolvent from a balance sheet standpoint, with its liabilities exceeding assets by more than $11,000,000. Finally, the Debtor continued to be well below its minimum requirement for reserves, with the report concluding "as of December 31, 2008, the Community was not in satisfactory actuarial balance as determined using generally accepted actuarial standards and applying the statutory requirements defined in part 350.1(s) of the Department of Regulation number 140 (11 NYC RR 350.1(s)). The Community's minimum actuarial surplus requirement, as determined using generally accepted actuarial standards applying statutory requirements was deficient in the amount of $16,679,330 as of December 31, 2008. Further, as of December 31, 2010, the actuarial surplus was deficient in the amount of $11,000,120."

43.     The DFS report was received and presumably read by the Director Defendants and Officer Defendants. There is nothing in the Debtor's Board of Director minutes to suggest that

Defendants considered, much less acted on, any plan to correct the gross deficiencies noted by DFS. What is apparent, however, is that Defendants chose not to disclose to applicants or residents either the existence of the DFS report or its conclusion as to the Debtor's insolvency or its grossly deficient reserves.

44.    In a series of annual audits, the Debtor's outside auditors, Abbate DeMarinis, LLP, likewise concluded that the Debtor was insolvent. The auditors' report consistently recognized the Debtor's annual operating deficits and that the Debtor was at a significant risk of ceasing operation as a going concern.

45.    In the Debtor's audited financial statements for the years ended December 31, 2011, and December 31, 2012, Abbate DeMarinis, LLP concluded that as of December 31, 2011, the Debtor had a negative net worth of $25,756,048. By year end 2012, the Debtor's negative net worth had further declined to a negative $27,011,656. Noting the Debtor's highly precarious financial condition, its auditors were required to issue a going concern opinion which provided in relevant part:

> . . . [T]he Company has suffered recurring deficiency of unrestricted operating revenues over operating expenses, working capital deficiencies, and negative cash flow from operating activities that has raised substantial doubt about its ability to continue as a going concern.

46.    In the explanatory notes to the 2011-2012 audit, the auditors further noted:

> The Facility has suffered recurring deficiencies of unrestricted operating expenses, working capital deficiencies, negative cash flow from operating activities, as well as adverse key financial ratios that has raised substantial doubt about its ability to continue as a going concern.

47.    Although the Debtor's audited financial statements for the years ending December 31, 2011, and December 31, 2012, note that "management has put into action a plan to reduce operating expenses and increase residency occupancy [and that] management anticipates it will

eventually bring the facility to a break even/modest profitability," the minutes of meetings of the Board of Directors do not disclose any plan to turn the Debtor to profitability. In fact, the Debtor failed to reach profitability. For the year ended December 31, 2012, the Debtor lost $640,740; it recognized a net loss for 2013 of $224,393. The Debtor's negative net worth continued to climb to a negative $27,474,480, and the auditors again issued a going concern opinion stating:

> The Company has suffered recurring decreases [sic] in net liabilities, has working capital deficiencies, has negative cash flow from operating activities as well as adverse key financial ratios and has raised substantial doubts about its ability to continue as a going concern.

48.     The Debtor's dismal financial performance continued into 2014 and 2015. The audit for 2014 revealed that the Debtor had finally recognized a modest operating profit. Its negative net worth, however, had further declined to a negative $28,832,287, and the auditors were again required to issue a going concern opinion. The auditors again noted substantial doubt that the Debtor could continue as a going concern, but added that management had an undisclosed plan to reduce expenses, increase revenue, and return the Debtor to profitability.

49.     The audited financial statements for the year ended December 31, 2015, revealed that the Debtor had returned to a net loss in operations, had become yet further insolvent, and was the subject of another going concern opinion. During the year, the Debtor's expenses exceeded its revenues by nearly $1,800,000, and its liabilities continued to exceed assets by well over $23,000,000. The auditors yet again concluded: "the Company has suffered recurring increases in net liabilities, has working capital deficiencies, has negative cash flow operating activities as well as adverse key financial ratios that has raised substantial doubt about its ability to continue as a going concern." As in the audit for the past five years, the audit noted the management had a plan to return to profitability, but provided no hint as to any such plan.

### C. Failure to Make Required Disclosures

50.     New York law provides that before a person may enter into a residency agreement, the operator of the CCRC must provide that potential resident with a disclosure statement detailing the services to be provided to the resident, all fees and expenses which will be charged to the residents, the principal terms and conditions of the residency agreement, and other material facts bearing upon the facility and financial obligation between the operator and the resident. In addition, the operator must provide the potential resident with extensive financial disclosures, including a copy of the operator's audited financial report for the most recent fiscal year and other related disclosures.

51.     New York law further provides that failure to provide the statutorily mandated disclosures subjects the operator and various persons affiliated with it (including employees, officers, and directors) to liability for substantial damages, refunds of various fees (including entrance fees), costs, and attorney's fees. In addition, knowing failure to provide the disclosure statement and Financial Disclosures exposes the operator and persons associated with it to criminal penalties. Notwithstanding the substantial exposure and damages for failing to provide the required disclosures for several years preceding the Petition Date, Defendants caused the Debtor to fail to make required disclosures.

52.     Upon information and belief, the Debtor never provided the required Financial Disclosures to potential residents, persons who submitted residency applications, or those persons who ultimately signed residency agreements prior to execution or transfer of money, as required by law. Debtor's 2006 disclosure statement makes no reference whatsoever to financial statements. The 2012 version of the disclosure statement does contain a cryptic reference to the Debtor's financial statements but states that financial statements will only be made available upon specific

request. That language is at direct odds with the plain language of the statute that specifically and expressly requires that the Financial Disclosures be tendered to an applicant.

53.     Further, the Defendants distributed disclosure statements to prospective resident that gave the false impression that Westchester Meadows was complying with state regulations concerning the maintenance of financial reserves.  For example, Westchester Meadows's "Type B Disclosure Statement," dated February  2012, included the following: "RESERVES:  Under New York law, continuing care retirement communities are required to maintain liquid assets supporting reserve funds once the community becomes operational.  Further, the regulations require maintenance of certain other reserves.  Sponsor must demonstrate to the satisfaction of the Superintendent of Insurance for the State of New York that it is maintaining all necessary reserves."  The disclosure statement, however, failed to inform potential residents that, in fact, Westchester Meadows was not in compliance with New York law and did not maintain sufficient reserves.

54.     Individuals who executed residency agreements were not provided with the required Financial Disclosures as required by law.

55.     The Officer Defendants and Director Defendants knew or should have known that their marketing of the facility was consistently performed in direct violation of applicable New York law. They also knew, or should have known, that marketing of the facility in violation of New York law exposed the Debtor to claims by residents totaling in the tens of millions of dollars and to criminal penalties.

**D.  The Debtor's Persistent and Knowing Failure to Comply with Regulatory Requirements as to Reserves**

56.     At all relevant times, the Debtor failed to maintain the actuarial reserves required by New York law. The Officer Defendants repetitively proposed restoration plans, all of which

were based on unrealistic projections of occupancy and fee income and all of which were abject failures. The Director Defendants wholly abdicated their duty to ensure the development and implementation of a viable restoration plan. Dealings between the Debtor and DFS in 2012-2013 are illustrative.

57.     As of May 31, 2010, the Debtor did not have a "satisfactory actuarial balance." The Debtor's minimum actuarial surplus was deficient by more than $11,000,000. The restoration plan noted in the Department of Insurance's 2007 report had plainly failed. On May 31, 2011, the Debtor then submitted another proposed restoration plan, which DFS rejected.

58.     In a letter dated May 30, 2012, after DFS rejected the Debtor's first proposed plan of restoration, the Debtor conceded to DFS that its financial problems threatened the "continued viability" of the CCRC. The Debtor recognized that its model was "financially flawed" and if it could not amend its residency agreements to eliminate the refundable portion of the entrance fee, the Debtor would fail. The correspondence issued on behalf of the Debtor acknowledged that the actuarial projections supporting the Debtor's originally submitted plan of restoration were flawed and that projections of future occupancy rates were overstated. In fact, the Debtor's occupancy rates did not grow during 2011, as projected, but declined. As of the date of the correspondence, the Debtor's liability for entrance fee refunds to current residents was approximately $30,000,000.

59.     The May 30, 2012 letter asserted that the Debtor intended to refinance its mortgage "on an expedited basis." In fact, although over the following three years board members would repeatedly raise the need to refinance the Debtor's mortgage, refinancing never occurred and there is no indication there was any serious effort to refinance.

60.     On August 13, 2012, the Debtor's revised plan for restoration was accepted by DFS. Pursuant to the restoration plan, the Debtor was obligated to provide monthly reports to DFS with

respect to results of operation and its refund obligations to residents. The restoration plan assumed the Debtor would achieve a required actuarial surplus by increasing its occupancy rates from 75% to approximately 90%. This was the same assumption underlying the prior and failed restoration plan. Defendants knew or should have known that the projected occupancy rates and the restoration plan were unreasonable and could not be met. In fact, the occupancy rates were not met.

61.     About the time that the 2012 restoration plan was approved, DFS requested from the Debtor information concerning the December 31, 2012 actuarial study updated as of April 11, 2013. DFS noted the study was premised on a projected increase in occupancy by 24 units from July 2013 to December 2013, which DFS viewed as unreasonable. DFS also noted that the actuarial study used a cash requirements estimate that was substantially lower than the actual cash requirements detailed in the Debtor's audited financial statements for year end December 31, 2012. DFS requested that the Debtor submit the current cash requirements estimate and that the actuarial study be updated to reflect the actual cash requirements. DFS also noted the actuarial study used an asset value that was almost $2 million greater than the value of the assets reported in the Debtor's audited financial statements.

62.     The Debtor did not respond to DFS until Defendant Perino's letter of October 1, 2013. He provided no explanation for the unreasonable projection of new residents, asserting only that the projections included in the actuarial report were based on current information at the time and "expertise of the actuary." He further asserted that the lower cash requirements were accurate.

63.     DFS promptly responded to the Debtor, asserting in correspondence dated October 8, 2013, that DFS could not accept the projected large increase in the occupancy and, further, that the July 2013 cash requirement showed a deficiency. DFS requested revised projections and a plan to address that deficiency. Defendants did not provide a substantive response.

**E. Failure to Cure the Multiple Deficiencies Cited by DFS**

64.     At all relevant times, the Officer Defendants and Director Defendants were aware of significant reserve deficiencies, deficient operating performances, and the substantial likelihood the Debtor would fail. The Officer Defendants did nothing more than pay lip service to their baseless hope that revenues would grow and expenses would be cut. The Director Defendants, who were ultimately responsible for the management and survival of the Debtor and the performance of its obligations to creditors and residents, abdicated their duties, failed to act in good faith, and turned a blind eye to the proven ineptitude of the Officer Defendants.

65.     Each of the Debtor's audited financial statements included the patently hollow representations that Defendants were seeking to implement a plan which could permit the Debtor to return to profitability. The reality was far different; the multiple deficiencies cited by DFS, Department of Insurance, and the Debtor's auditors were never cured. Indeed, as late as August 20, 2015, DFS issued a "Statement of Deficiency" detailing the Debtor's noncompliance with article 46 of the Public Health Law. Among other gross deficiencies, DFS noted that the Debtor's funds to support its minimum reserve requirements were deficient by over $4.6 million and that the Debtor had failed to pay refunds to six former residents as required by law.

**F. The Debtor's Financial Condition is Hidden from Residents**

66.     All of the residents at the Debtor's facility are elderly, many are disabled or have impaired faculties, and all are dependent upon the Debtor for provision of housing and support services. In effect, the residents are under the control of the Debtor, and the Debtor and each of the Defendants owe fiduciary duties to the residents and their representatives.

67.     Notwithstanding those fiduciary duties, Defendants never provided the residents and their representatives with meaningful disclosure of the Debtor's grossly inadequate reserves,

its deficient financial condition, or its violation of multiple provisions of New York law. By way of illustration only, residents and their representatives were never provided with copies of the Debtor's audited financial statements. Accordingly, those residents were not aware that the Debtor was insolvent, had consistent operating losses, and had received going concern opinions from its auditors starting no later than 2011 and continuing through 2015.

### G. Defendants' Failure to Make Any Meaningful Effort to Make the Debtor Solvent or Otherwise Restructure Its Financial Condition

68.     At all relevant times, the Debtor was insolvent. In each of the audited financial statements available to the Plan Administrator, the Debtor's auditors reported that "management has put into action a plan to reduce operating expenses and increase residential occupancy, that management anticipates it [sic] will eventually bring the Facility to a break even/modest profitability."

69.     Management's supposed "plan" to make the Debtor marginally profitable appears in none of the Board of Directors' minutes recorded between 2011 and 2015, and despite diligent search, the Plan Administrator has not obtained any other document that discloses the contents of any such plan. It is apparent from the result of operations, however, that if a plan was ever implemented, it was entirely unsuccessful.

70.     The Debtor did recognize a marginal increase in revenues between 2011 and 2015. During that same period, however, its expenses increased by more than 44% or approximately $4,000,000. This resulted in its operating deficit increasing from approximately $540,000 in 2011 to nearly $1,800,000 in 2015.

71.     Notably, during this same period, Defendants did nothing to reign in the salaries of senior management including, in particular, of the Officer Defendants. In 2012, the Debtor and affiliates employed seven executives who each earned in excess of $140,000 per year. Despite the

obvious need to reduce operating costs, the Debtor continued to employ that number of executives earning in excess of $121,000 in 2014, and the total pay for all of these executives had increased since 2011.

72.     The excessive compensation paid to Defendant Barrett is illustrative of the Defendants' failure to make any meaningful efforts to reduce expenses and restructure the Debtor's precarious financial position. From at least 2012 through 2015, Ms. Barrett was paid in excess of $545,000 annually. Notably, the minutes of meetings of the Board of Directors are devoid of any discussion of the propriety of Ms. Barrett's salary, or the salary of any other senior executives for that matter. Indeed, it does not appear the Board made any effort to ascertain the reasonableness of Ms. Barrett's salary, to consider reducing the salary paid to her, or even to determine how that salary compared to those of other institutions facing operating deficits and insolvency.

73.     In 2015, Defendants belatedly engaged an outside consultant to evaluate the reasonableness of salaries paid to the Debtor's senior management. The consultant released its report in May, 2015. The reasonableness and credibility of the analysis prepared by the outside consultant is highly suspect. For example, the consultant defined the Debtor's peers to be 13 nonprofit corporations that provided various levels of assisted living to the elderly, but that had revenues significantly greater than those of the Debtors. Also, it appears these so-called "peers" operated larger facilities than Westchester Meadows. The Debtor's revenues were lower than all 13 of its supposed "peers" and at least two of those peers had revenues over 300% greater than the Debtor. For the peer group as a whole, the average revenues were approximately 90% greater than those of the Debtor; the median for the peer group was more than 100% greater than the Debtor's revenues.

74.     Even compared with these supposed "peers" that operated much larger and more profitable institutions, Ms. Barrett's salary was unreasonably excessive amounting to 165% of the average for chief executive officers employed by the 13 "peers."

75.     Incredibly, although as of May 2015 the Debtor was in serious financial straits and unable to pay its debts timely, the Board apparently never considered reducing Ms. Barrett's compensation. She continued to be the grossly overpaid captain of a rapidly sinking ship.

**H. The Restructure Committee; Its Retention of Law Firms Associated with Director Defendants and Belated Disclosure to Residents**

76.     Sometime during the first quarter of 2014, certain members of the Board of Directors of the Debtor and of the boards of its affiliates elected to form an ad hoc Restructure Committee.

77.     Both Defendant Pearce and Defendant Goldberger were members of the ad hoc Restructure Committee. The Restructure Committee retained Bryan Cave, LLP, a law firm of which Mr. Pearce is a member, and McCullough, Goldberger and Staudt, LLP, a law firm of which Mr. Goldberger was a member. Both firms were paid significant fees.

78.     The Restructure Committee determined that the Debtor and certain of the affiliates could be salvaged if a nursing home owned by one of the affiliates was sold and the proceeds applied to obligations of the Debtor and affiliated entities.

79.     This approach to such a financial restructuring was wholly unreasonable and unrealistic. The owner of the nursing home was itself a New York non-profit corporation and its assets could be transferred only if (i) its creditors were fully paid and (ii) the transfers were approved by a judgment of the New York Supreme Court after due notice, pre-trial proceedings, and hearings. Neither of those conditions could be satisfied in a timely fashion.

80.    Apparently sometime in the first quarter of 2015, the Restructure Committee realized that its plan for salvaging the Debtor was wholly unworkable and advised other members of the Debtor's Board of the critical need for some alternate restructuring plan. Hon. Bertram Gelfand (Ret.), a long-time Board member who had not served on the Restructure Committee wrote:

> As late as the December 2014 Board meeting, it was repeatedly presented to the Board that with the completion of the sale of the Nursing Home all financial problems related to the Hebrew Hospital Home and its associated units would be solved. What was presented at the April 7, 2015 meeting was in sharp contrast to what was disclosed through the December 2014 meeting. It was not until mid-February, 2015 that it was presented that an urgent necessity existed to "restructure."

81.    Judge Gelfand went on to note that both Messrs. Goldberger and Pearce had significant conflicts of interest as a result of the engagement of their respective law firms, who were budgeted together to be paid fees that "could well exceed one million dollars ($1,000,000)." Judge Gelfand further asserted that the engagement of the two firms and the potential fees to be paid to them were never disclosed to the Debtor's full Board.

82.    Residents were not made aware of the existence of the ad hoc Restructure Committee or the several meetings referenced by Judge Gelfand. On the contrary, prior to July 2015, residents were assured of the financial health of the Debtor.

83.    Marketing materials provided by the Debtor to applicants and residents painted a rosy picture of the Debtor's financial health. For example, concerning entrance fee refunds, the Debtor's marketing materials touted "Life Care will maximize asset preservation to insure your estate won't be depleted . . . choosing Life Care is one of the smartest choices you could make. You are insuring the financial legacy you've worked so hard for is preserved . . . ."

84. Communications by Defendants to residents likewise misrepresented the Debtor's financial health. Typical was a letter to residents in 2012 announcing modest increases in fees while emphasizing "we all realize the importance of a sound financial community with a result of satisfaction to the highest level. Management of Westchester is committed to this charge . . . ." Notably absent from that dialogue was the reality that the Debtor was insolvent and wholly incapable of paying its obligations to the residents.

85. By the end of the second quarter of 2015, it had become obvious even to the Defendants that the Debtor would be required to cease operations unless it could sell Westchester Meadows or otherwise complete a fundamental restructuring. By that time, the Debtor was no longer able to pay its bills timely and was in default in payment of refund fees due to former residents.

86. In mid-July, the Board sent a letter to residents that first advised of the Debtor's "financial distress" and the likely need to sell Westchester Meadows. Nonetheless, Defendants continued to hide the extent of the Debtor's financial problems. Defendants failed to disclose, for example, either the going concern opinions or critical public reports.

87. By the time the July letter was delivered to residents, Defendants had concluded that the Debtor would be required to seek relief under Chapter 11 and that any sale of Westchester Meadows likely could only be effectuated through Chapter 11. Incredibly, Defendants did not apprise residents of those conclusions. And, despite realizing bankruptcy was imminent, Defendants failed to retain investment bankers with any meaningful expertise in selling facilities similar to Westchester Meadows, facilities under financial distress, or facilities subject to Chapter 11 reorganization proceedings.

88.     Well before the Petition Date, it was obvious to Defendants that the Debtor's facility would need to be sold. Nonetheless, no Defendant took effective steps to assemble a team of professionals who could competently market the Debtor's facility. Accordingly, it was not until the summer of August 2016 that the Debtor's facility was sold. Although the proceeds from that sale were sufficient to pay secured creditors, there were virtually no funds available for satisfaction of claims of former residents for repayment of their entrance fees or payment of the claims of other unsecured creditors. As of this date, the Debtor has no funds with which to pay claims substantially exceeding $25,000,000.

89.     The purchaser of Westchester Meadows permitted residents to remain at the facility conditioned upon executing an addendum to their respective residency agreements. Each attendee provided that the buyer might refund all or some part of the residents' entrance fees. Notably, however, the buyer's agreement to do so was contingent on reaching certain financial targets. If the buyer failed to meet its financial targets, it would have no obligation to refund the entrance fees and residents will be left with unpaid obligations exceeding $30,000,000.00. There is a very high likelihood that many residents or their heirs will never receive a full repayment of their entrance fees.

## COUNT I

### BREACH OF FIDUCIARY DUTY BY THE OFFICER DEFENDANTS

90.     The Plan Administrator repeats and realleges paragraph 1 through 89 as though set forth herein in full.

91.     Each of the Officer Defendants owed fiduciary duties of good faith, loyalty, and care to the Debtor. In this regard, § 717 of the New York Not-For-Profit Law provides that

"directors and officers shall discharge the duties of their respective positions in good faith and with the care as an ordinarily prudent person like position would exercise under similar circumstances."

92.     As set forth above, each of the Officer Defendants failed to discharge his or her duties to the Debtor in good faith and with the degree of care an ordinarily prudent person in a like position would exercise under like circumstances. Indeed, the Officer Defendants conducted and discharged their duties in a manner that was negligent, grossly negligent, and reckless.

93.     Further, upon the Debtor becoming insolvent, which occurred no later than 2007, the Officer Defendants owed fiduciary duties to the creditors of the Debtor to maximize prospects for repayment of their respective claims. As set forth above, the Officer Defendants breached their fiduciary duties to the creditors by acts or omissions they committed with negligence, gross negligence, or recklessness. These acts and omissions include the following:

a)      The Officer Defendants took no action (or at least no meaningful action) to alter the Debtor's patently failed business model or to restructure its finances in a manner which would permit the Debtor to become solvent and to honor its obligations to its residents and other creditors.

b)      The Officer Defendants caused the Debtor to conduct its operations in continuous violation of New York statutes and regulations applicable to the Debtor including, in particular, those requiring disclosures to applicants and residents and maintaining required reserves.

c)      The Officer Defendants failed to disclose to applicants and residents that the Debtor was insolvent, had grossly inadequate reserves, had

repetitively received going concern opinions from its auditors, and routinely incurred significant operating losses.

d)      The Officer Defendants failed to establish adequate reserves as required by applicable New York law or to undertake any reasonable efforts to establish and maintain these reserves.

e)      The Officer Defendants routinely issued projections of occupancy and revenues which the Officers knew or should have known to be grossly inflated.

f)      The Officer Defendants failed to take any meaningful steps to address the multiple criticisms and deficiencies noted by DFS and the Department of Insurance.

g)      The Officer Defendants routinely misled residents as to the financial condition of the Debtor.

h)      The Officer Defendants failed to properly prepare for or prosecute the Debtor's Chapter 11 case.

93.     Each of the Officer Defendants is a compensated officer, and accordingly, is not entitled to the limitation of liability set forth in New York Not-for-Profit Law § 720-a.

94.     The acts and omissions of the Officer Defendants occurred over a period of many years and continued until at least the Petition Date. No action could be taken against the Officer Defendants, however, because (i) they continued to hold their respective positions; (ii) the conduct of the Officer Defendants was hidden; and (iii) the Debtor was at all times under the domination and control of the Officer Defendants.

95.     As a result of the multiple breaches of duty by the Officer Defendants, individually and collectively outlined above, the Debtor suffered significant damages. The amount of these damages will be established at the trial of this matter but are estimated to exceed the sum of $25,000,000.00.

## COUNT II

## BREACH OF FIDUCIARY DUTIES BY THE DIRECTOR DEFENDANTS

96.     The Plan Administrator repeats and realleges paragraphs 1 through 95 as though set forth herein in full.

97.     Each of the Director Defendants owed fiduciary duties of good faith, loyalty, and care to the Debtor. In this regard, Section 717 of the New York Not-for-Profit Law provides that "directors and officers shall discharge the duties of their respective positions in good faith and with the care of an ordinarily prudent person in a like position would exercise under similar circumstances." New York law further provides that the Director Defendants may rely upon information provided by certain other individuals, but only when such reliance is in good faith. The Director Defendants could not have relief in good faith upon any information or opinions of the Officer Defendants or others because the Director Defendants were aware of numerous facts demonstrating the Debtor's failing financial condition and failure to comply with New York law.

98.     Each of the Director Defendants was a member of the Board of Directors of the Debtor at a time when the Debtor was (i) insolvent; (ii) in violation of multiple New York statutes and regulations; (iii) the subject of a going concern opinion; and (iv) had grossly deficient reserves. Certain of the Director Defendants, including Messrs. Pearce and Goldberger, served from sometime in 2007 until well after the Petition Date. The Director Defendants failed to discharge

their duties in good faith and with the care of an ordinarily prudent person. Indeed, the Director Defendants abdicated their duties and conducted themselves in bad faith.

99.     The Director Defendants were obligated to oversee and manage the Debtor. The Director Defendants were obligated to make informed decisions concerning the Debtor, using reasonable diligence to educate themselves as to the Debtor's operations and financial condition. As alleged above, the Director Defendants failed to make reasonable efforts to educate themselves as to the true financial condition of the Debtor or deliberately failed to take any action in response to the Debtor's failing financial condition.

100.     In view of the numerous red flags raised to them, including the reports of the Department of Insurance, Department of Financial Services, and independent auditors, the Director Defendants knew or certainly should have known that the Debtor was insolvent, had adopted and was pursuing a failed business model, routinely incurred annual operating deficits, and was the subject of going concern opinions. Rather than acting to address these obvious and fundamental issues, the Director Defendants abdicated their duties and made no meaningful efforts to restructure the Debtor.

101.     It does not appear that any serious thought was given to the restructuring of the Debtor until late 2014 and the proposal that was considered in late 2014 and early 2015 was wholly unworkable.

102.     At all relevant times, the Director Defendants knew or should have known of the multiple red flags signaling the Debtor's financial collapse and continuing and pervasive violations of New York law. The Director Defendants took no meaningful action but rather abdicated their duties by turning a blind eye to the Debtor's rapidly deteriorating condition.

103.     The Director Defendants acted with gross negligence or recklessness in repetitively breaching their fiduciary duties of care, loyalty and good faith by, among other acts, the following:

a)     permitting the Debtor's marketing to be conducted in violation of applicable New York Law;

b)     taking no action to ensure that the Officer Defendants marketed the Debtor in compliance with New York law or to make disclosures required by New York statutes and regulations;

c)     failing to ensure that the Debtor established and maintained statutorily required reserves and failing to develop and implement any viable plan for satisfying reserve requirements;

d)     causing the Debtor to pay excessive salaries to Officer Defendants;

e)     failing to establish and implement any meaningful restructuring plan despite repeated assurances to the auditors that a restructuring plan would be implemented;

f)     permitting the Debtor to continue to operate in a business-as-usual manner despite being insolvent;

g)     failing to take any steps to ensure that the Debtor would have the resources to satisfy refund obligations to residents;

h)     organizing an ad hoc Restructure Committee represented by the law firms of two of the Director Defendants, who took no meaningful steps to restructure;

i)     permitting the retention of Messrs. Goldberger's and Pearce's law firms without adequate disclosure to all members of the Board of Directors of the Debtor; and

j)      failing to inform applicants and residents of the Debtor's insolvency, inadequate reserves, and receipt of repetitive going concern opinions and critical reports from regulators.

104.    The acts and omissions of the Director Defendants occurred over a period of many years and continued until at least the Petition Date. No action could be taken against the Director Defendants, however, because (i) they remained members of the Debtor's Board; (ii) the conduct of the Director Defendants was hidden; and (iii) the Debtor was at all times under the domination and control of the Director Defendants.

105.    The Debtor suffered significant damages as a result of the acts, conduct and omissions of the Director Defendants and suffered monetary damages which will be proven at the trial of this matter but which are estimated to exceed the sum of $25,000,000.00.

## COUNT III

### BREACH OF FIDUCIARY DUTIES OWED TO
### CURRENT AND FORMER RESIDENTS

106.    The Plan Administrator repeats and realleges paragraphs 1 through 105 as though set forth herein in full.

107.    The Plan Administrator brings this Count III as assignee of the claims of current and former residents of Westchester Meadows, as described herein above.

108.    All Officer and Director Defendants owed fiduciary duties to the current and former residents of Westchester Meadows including all of the Assignors. The Assignors and other current and former residents were under the control of and wholly dependent upon the Officer and Director Defendants and the Westchester Meadows's employees employed by them.

109.    Officer and Director Defendants repetitively breached fiduciary duties owed to the Assignors.

110. The Director and Officer Defendants acted with gross negligence or recklessness in repetitively breaching their fiduciary duties to their Assignors by, among other acts, the following:

a) permitting the Debtor's marketing to be conducted in violation of applicable New York Law;

b) taking no action to ensure that the Officer Defendants marketed the Debtor in compliance with New York law or to make disclosures required by New York statutes and regulations;

c) failing to ensure that the Debtor established and maintained statutorily required reserves and failing to develop and implement any viable plan for satisfying reserve requirements;

d) causing the Debtor to pay excessive salaries to Officer Defendants;

e) failing to establish and implement any meaningful restructuring plan despite repeated assurances to the auditors that a restructuring plan would be implemented;

f) permitting the Debtor to continue to operate in a business-as-usual manner despite being insolvent;

g) failing to take any steps to ensure that the Debtor would have the resources to satisfy refund obligations to residents; and

h) failing to inform applicants and residents of the Debtor's insolvency, inadequate reserves, and receipt of repetitive going concern opinions and critical reports from regulators.

111. The acts and omissions of the Officer and Director Defendants occurred over a period of many years. No action could be taken against the Officer and Director Defendants,

however, because (i) the Defendants never disclosed the wrongful conduct to the Assignors; (ii) the conduct of the Officer and Director Defendants was hidden; and (iii) the Debtor was at all times under the domination and control of the Director Defendants.

112.     The Assignors suffered significant damages as a result of the acts, conduct and omissions of the Director and Officer Defendants and suffered monetary damages which will be proven at the trial of this matter but which are estimated to exceed the sum of $25,000,000.00.

## COUNT IV

## VIOLATION OF DISCLOSURE REQUIREMENTS
## MANDATED BY NEW YORK LAW

113.     The Plan Administrator repeats and realleges paragraphs 1 through 112 as though set forth herein in full.

114.     The Plan Administrator brings this Count IV as assignee of the claims of current and former residents of Westchester Meadows, as described herein.

115.     Article 46 of the New York Public Health Law and regulations promulgated thereunder required that the Debtor make exhaustive disclosures concerning its financial condition, actuarial studies, reserves, ability to satisfy refund obligations and solvency. Among other obligations, applicable New York law mandated that current and former residents—the Assignors—be provided with copies of the Debtor's audited financial statements and full and complete disclosure with respect to both reports on the Debtor by regulatory bodies and the Debtor's insolvency, negative reserves, and repetitive going concern open issues.

116.     The Officer and Director Defendants were under statutory duties to ensure the Debtor operated in a transparent manner and complied with its statutory disclosure objections.  In fact, Officer and Director Defendants did the opposite and hid the Debtor's disastrous financial condition from the Assignors.

117.     As a result of the Officer and Director Defendants' pervasive violations of statutory disclosure obligations, the Plan Administrator is entitled to recover the application charges, entrance fees, and other fees and charges paid by each of the Assignors to the Debtor together with interest, costs, and reasonable attorneys' fees as allowed by N.Y. Pub. Health Law § 4618.

## COUNT V

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349

118.     The Plan Administrator repeats and realleges paragraphs 1 through 117 as though set forth herein in full.

119.     The Plan Administrator brings this Count V as assignee of the claims of current and former residents of Westchester Meadows, as described herein above.

120.     By virtue of the conduct described above, Assignors have been injured and suffered damages by violations of Section 349(a) of New York General Business Law (the "GBL"), which states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

121.     Defendants engaged in acts and practices that were deceptive or misleading in a material way and that injured Assignors. Such acts and practices were likely to and did mislead the current and former residents concerning the financial condition of Westchester Meadows and its ability to honor its financial commitments. Defendants' deceptive acts include failing to disclose the Debtor's financial condition and instead implying that it could honor its financial commitments when in fact it could not do so.

122.     Assignors and the Plan Administrator as the Assignee have been damaged by Defendants' violations of Section 349 of the GBL, for which the Plan Administrator seeks recovery

of the actual damages suffered by Assignors because of Defendants violations of Section 349, in an amount to be determined at trial.

123.  The Plan Administrator also seeks treble damages and an award of reasonable attorney's fees pursuant to Section 349(h) of the GBL.

## COUNT V

## NEGLIGENT MISREPRESENTATION/OMISSION

124.  The Plan Administrator repeats and realleges paragraphs 1 through 123 as though set forth herein in full.

125.  The Plan Administrator brings this Count V as assignee of the claims of current and former residents of Westchester Meadows, as described herein.

126.  Because of the special relationship created with residents of Westchester Meadows, each of the Officer and Director Defendants owed a duty to the Assignors under the applicable statutes described above, and/or common law, to disclose the true and complete financial condition of Westchester Meadows.

127.  By virtue of the conduct described above, each of the Officer and Director Defendants negligently and/or recklessly breached his or her legal duty to Assignors, by failing to disclose, or causing others to fail to disclose, the material facts concerning the dire financial condition of Westchester Meadows.

128.  As a direct and proximate cause of the foregoing negligence, Assignors have been injured.

129.  The Plan Administrator seeks recovery of the actual damages suffered by Assignors as may be proven at trial.

## JURY DEMAND

The Plan Administrator demands a trial by jury on all issues triable to a jury. Pursuant to Bankruptcy Rule 7008, Plaintiff does not consent to the entry of final orders or judgment by the Court.

**WHEREFORE**, Plaintiff, Plan Administrator of the Amended Chapter 11 Plan of Liquidation of Hebrew Hospital Senior Housing, Inc., respectfully requests that there be judgment in favor of Debtor's estate and against Defendants and that Debtor's estate be awarded damages in an amount to be proven at trial which include, at a minimum, all application fees, entrance fees and other fees and charges paid by Assignors and the significant damages sustained by the Debtor and Assignors as a result of the Defendants' repetitive breaches of fiduciary and statutory duties, and treble damages allowed by Section 349(h) of the New York General Business Law, together with interest, costs, attorney's fees, and other such relief as may be just and equitable.

Dated: December 6, 2018

**FISHMAN HAYGOOD, LLP**

By:    /s/ Brent B. Barrire
Brent B. Barriere
*Admitted Pro Hac Vice*
Jason W. Burge
*Admitted Pro Hac Vice*
Alysson L. Mills
*Admitted Pro Hac Vice*
D. Skylar Rosenbloom
*Admitted Pro Hac Vice*
Kristen D. Amond
*Admitted Pro Hac Vice*
***Co-Special Litigation Counsel for Plaintiff***
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
bbarriere@fishmanhaygood.com

jburge@fishmanhaygood.com
amills@fishmanhaygood.com
srosenbloom@fishmanhaygood.com
kamond@fishmanhaygood.com
and

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
David J. Stone
***Co-Special Litigation Counsel for Plaintiff***
885 Third Avenue
New York, NY 10022
Tel.: (212) 308-5858
Fax: (212) 486-0462
Email: eagel@bespc.com
        stone@bespc.com