| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURT | | <u>NOT FOR PUBLICATION</u> |
| SOUTHERN DISTRICT OF NEW YORK | | |

-----------------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **HHE CHOICES HEALTH PLAN, LLC,** *et al.,* | : | **Case No. 15-11158 (MEW)** |
| | : | **Case No. 15-13264 (MEW)** |
| **Debtors.** | : | **Case No. 16-10028 (MEW)** |
| | : | |
| | : | **(Jointly Administered)** |

-----------------------------------------------------------------x
| | | |
|---|---|---|
| **Sean Southard, as Plan Administrator of the** | : | |
| **Amended Chapter 11 Plan of Liquidation for** | : | |
| **Hebrew Hospital Senior Housing, Inc.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **-against-** | : | **Adv. Pro. No. 17-01240 (MEW)** |
| | : | |
| **Mary Frances Barrett, Brian Perino, Peter** | : | |
| **Sanna, Peter Cutaia, Alan Pearce, Charles** | : | |
| **Goldberger, Michael Laub, Marvin Lifson,** | : | |
| **Donna Jakubovitz, Edward Schecter, Leon** | : | |
| **Silverman, and David Kershner,** | : | |
| | : | |
| **Defendants.** | : | |

-----------------------------------------------------------------x

## <u>REPORT AND RECOMMENDATION REGARDING PRETRIAL MOTIONS</u>

The Plan Administrator appointed under the confirmed chapter 11 plan of liquidation of

Hebrew Hospital Senior Housing, Inc. ("**HHSH**") has alleged that officers and directors of

HHSH breached fiduciary duties, violated New York State disclosure requirements, engaged in

deceptive acts or practices and made negligent misrepresentations or omissions in connection

with the marketing and management of the Westchester Meadows continued care retirement

facility.  Some of the claims are asserted by the Plan Administrator as successor to HHSH.

Other claims are asserted by the Plan Administrator as the express assignee of claims that

formerly belonged to certain residents of HHSH.

## Jurisdiction

The parties agree that this adversary proceeding is "related to" the underlying bankruptcy cases but they have not consented to the entry of a final judgment by this Court. Accordingly, this Court only has the authority to issue a report and recommendations that will be subject to *de novo* review by the District Court. *See* 11 U.S.C. § 157(c)(1); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1940 (2015). The Plan Administrator has also asked for a jury trial and has not consented to the conduct of a jury trial in this Court pursuant to 28 U.S.C. § 157(e). The District Court denied a prior motion to withdraw the reference without prejudice to the renewal of that motion when pretrial proceedings have been completed and the matter is ready for trial.

## The Pretrial Motions

Defendants have moved for partial summary judgment as to all claims asserted against Leon Silverman and David Kershner, contending that there is no genuine issue for trial as to whether these individuals were officers or directors of HHSH. [ECF Nos. 80, 81.] The parties have also made motions *in limine* to exclude certain evidence. Defendants wish to exclude or limit the testimony of Plaintiff's proposed expert witness, J. Lester Alexander, III [ECF Nos. 84, 85], and wish to preclude the Plan Administrator's counsel from referring to the HHSH business as a "Ponzi" or "pyramid" scheme [ECF Nos. 77, 79]. The Plan Administrator wishes to exclude all evidence of alleged regulatory approvals of the disclosure statements that HHSH distributed to residents and/or prospective residents [ECF No. 76], and wishes to exclude evidence of what it regards as "speculative collateral source payments." [ECF No. 75].

The Court heard argument on August 21, 2019 and made its initial rulings at that time. After the Court made its initial rulings the Plan Administrator filed a motion seeking permission to amend and to supplement Mr. Alexander's expert witness report and to re-open discovery to

the extent necessary to address those changes.  The Court heard argument on that motion on

October 17, 2019.  This Report summarizes the Court's recommendations to the District Court

regarding each of the motions, including the motion to supplement Mr. Alexander's report.

I.      **The Motion for Partial Summary Judgment**

        Summary judgment is proper if there is no genuine issue as to material facts and if as a

result a party is entitled to judgment as a matter of law.  Fed. R. Bankr. P. 7056; Fed. R. Civ. P.

56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Defendants contend that Mr. Silverman

and Mr. Kershner were not directors or officers of HHSH and that there is no genuine dispute

about this.

        With regard to Mr. Silverman:  The Plan Administrator has supplied evidence (in the

form of the minutes of the meeting of the HHSH board of directors dated April 17, 2007)

showing that a motion was made and seconded for the election of Mr. Silverman as a member of

"the Board of Directors of Hebrew Hospital Senior Housing and HHCS."  Defendants argue that

the minutes merely show that a motion was made but not that it was voted upon, but if this were

the sole basis of the motion for summary judgment as to Mr. Silverman the Court would

recommend the denial of the motion.  The minutes do not say that action on the motion was

being deferred for any reason.  The minutes also refer to two entities (HHSH and HHCS), and

Defendants acknowledge that Mr. Silverman was elected to be a director of HHCS.  If this were

the only evidence, a jury could infer that a motion to make Mr. Silverman a director of HHSH

was voted on and approved in April 2007.

        Even if there were reasons to believe that Mr. Silverman was elected as a board member

in 2007, however, the Plan Administrator has offered no evidence that he held that capacity at

any time within the reach of the relevant six-year statute of limitations.  HHSH was required to

list its directors and officers in its annual tax filings, and Mr. Silverman was never listed as a

director.  He also does not appear as a director on other lists that were maintained by the

company.  The Plan Administrator has speculated that these reports might be unreliable but he

has not offered any reason to believe that these contemporaneous reports were mistaken or that

the preparers of the reports had any reason to falsify them.  Other board members testified during

discovery, and there is not a single witness who contends that the contemporaneous lists of board

members were wrong or that Mr. Silverman actually was a director of HHSH.

Mr. Silverman was a director and officer of affiliated entities, and the Plan Administrator

has offered evidence that Mr. Silverman was often present when joint board meetings were held,

but that does not show that he was a board member of HHSH.  The Plan Administrator also has

submitted a copy of the board minutes of HHSH dated June 10, 2014 that listed Mr. Silverman as

a person who was "present" at the meeting, and has argued that this "presence" indicates that Mr.

Silverman was present "as a director."  However, that is not what the minutes say.  Rabbi

Edward Schecter also was listed as "present" at the same meeting, and the Plan Administrator

has separately acknowledged that Mr. Schecter was not a director of HHSH, and has agreed to

dismiss all claims against Mr. Schecter.

The Plan Administrator also argues that there is no evidence of a formal resignation by

Mr. Silverman after April 2007, but as the Court noted at the hearing it would be too much of a

stretch to treat Mr. Silverman as though he had somehow unknowingly been a director of HHSH

throughout the relevant period even though he was not treated as a director of HHSH during that

time and even though there is no evidence that he was regarded as a director of HHSH by

himself or by any other person.  Whether the 2007 minutes were wrong, or whether Mr.

Silverman later removed himself (or was removed) from the board in a manner that is not

reflected in the official minutes, is not entirely clear. It does not matter, however, given the total absence of any evidence that would permit a reasonable juror to conclude that Mr. Silverman acted as a director of HHSH at any relevant time.

As to Mr. Kershner: the March 9, 2011 minutes of the joint meeting of the boards of HHSH and HHCS state that Mr. Kershner was elected to the "board of directors" without clarifying whether that meant he was a member of the HHSH board, the HHCS board, or both. Similarly, the June 11, 2013 minutes of a joint meeting of the same two boards indicate that Mr. Kershner seconded a motion to elect Alan Pearce as Chairman without specifying whether he did so as a director of HHSH or HHCS. These records are ambiguous. Mr. Kershner did not appear as a director on the annual lists that HHSH prepared and filed. In the case of Mr. Kershner, however, there is other evidence that could support a finding that he was a director of HHSH and that creates a genuine issue for trial. The Plan Administrator provided copies of emails by which Mr. Kershner was informed that he would be asked at an upcoming HHSH meeting to vote on various issues including a defeasance of the Westchester Meadows bonds, and other emails in which he was provided information about marketing proposals for HHSH and maintenance fees charged by HHSH. Furthermore, Mr. Kershner admittedly was a member of an "executive committee" that often functioned on behalf of HHSH and/or its affiliates. Defendants wish to argue, apparently, that Mr. Kershner was a member of an "executive committee" only for other companies and that this did not mean he was a director of HHSH, but there is a genuine issue of fact as to whether there was a single executive committee for all of the entities and also as to whether the executive committee (to the extent it acted as an executive committee with respect to HHSH) was required, under HHSH's own by-laws, to be comprised entirely of people who were also directors of HHSH.

Defendants also argued in support of their motion that even if Mr. Kershner was a director the claims should be dismissed because the Third Amended Complaint contained only conclusory allegations about his involvement in allegedly wrongful conduct. The Plan Administrator correctly noted that this belated attack on the pleadings was improper because no motion to dismiss on this ground had been filed. *See* Fed. R. Civ. P. 12, incorporated by reference in Fed. R. Bankr. P. 7012. The Plan Administrator further argued that the allegations and evidence about alleged wrongful conduct had been fleshed out during discovery, and that for purposes of summary judgment the only issue is whether there is now sufficient evidence to allow those claims to go to the jury. In their reply papers the Defendants apparently dropped their separate contention that claims against Mr. Kershner should be dismissed because he did not participate in the allegedly wrongful behavior. In any event, it is plain from the record that issues relating to HHSH were debated and decided in Mr. Kershner's presence, and whether he participated in those decisions as a director (or merely observed them as a person who was a director of other entities and who was present at joint board meetings) is a matter that is subject to genuine dispute.

Accordingly, the Court's recommendation is that partial summary judgment be granted in favor of Mr. Silverman, dismissing all claims against him, but that the motion for partial summary judgment in favor of Mr. Kershner be denied.

## II.    The Motion to Limit or to Preclude Mr. Alexander's Testimony

Mr. Alexander is a certified public accountant and a litigation consulting expert with APA Group, LLC. As described below, there are certain respects in which Mr. Alexander's testimony is proper. However, there are many other ways in which Mr. Alexander purports to summarize various elements of the Plan Administrator's case, or to opine as to what the

Defendants knew or should have known, or to opine as to the truth or completeness of the

disclosure statements that the Defendants issued, or to summarize various documents that the

Plan Administrator seeks to offer in evidence.  In many of these ways Mr. Alexander's proposed

role "is more to argue the client's cause from the witness stand than to bring to the fact-finder

specialized knowledge or expertise that would be helpful in resolving the issues of fact presented

by the lawsuit."  *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp. 2d 531, 538 (S.D.N.Y. 2004).

Experts may testify about matters that require "scientific, technical or other specialized"

knowledge.  Fed. R. Evid. 702.  However, they may not offer purported "expert" testimony about

"lay matters which a jury is capable of understanding and deciding without the expert's help."

*Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).  In particular,

experts should not be permitted to "supplant the role of counsel in making argument at trial, and

the role of the jury in interpreting the evidence."  *See Primavera Familienstifung v. Askin*, 130

F.Supp. 2d 450, 527 (S.D.N.Y. 2001), *amended on reconsideration on other grounds*, 137

F.Supp. 2d 438 (S.D.N.Y. 2001).  Narrative summations of facts that are set forth in other

evidence are not proper subjects for expert testimony.  *See Taylor v. Evans*, No. 94 Civ. 8425

(CSH), 1997 U.S. Dist. LEXIS 3907, at *4-5 (S.D.N.Y. Apr. 1, 1997).  Opinions on matters that

are outside an expert's area of expertise – including opinions about the conduct or motivations of

the parties – are particularly inappropriate.  *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 688

(S.D.N.Y. 2003), *aff'd*, 99 F.App'x 274 (2d Cir. 2004).

An expert may testify about factual conclusions that require expertise, but may not

"usurp either the role of the trial judge in instructing the jury as to the applicable law or the role

of the jury in applying that law to the facts before it."  *See United States v. Lumpkin*, 192 F.3d

280, 289-90 (2d Cir. 1999).  Experts therefore may not testify about legal standards that properly

should be the subject of the trial court's jury instructions. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (holding that purported expert testimony about the meaning of "deadly physical force" impermissibly communicated a legal standard to the jury, but affirming because the lower court's error was harmless). Experts also may not offer their opinions about the ultimate legal issues to be decided at trial, and may not parrot statutory language in phrasing their conclusions or otherwise suggest (implicitly or explicitly) a legal standard to be applied by the jury. *United States v. Scop*, 846 F.2d 135, 139-40 (2d Cir. 1988) (holding that expert's testimony that the defendants had engaged in a manipulative and fraudulent scheme within the meaning of the securities laws was not within the permissible scope of expert testimony and was prejudicial); *S.E.C. v. U.S. Envtl., Inc.*, No. 94-cv-6608 (PKL)(AJP), 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002) (holding that an expert may make factual conclusions based on matters that reflect special expertise but that "the expert cannot give testimony stating ultimate legal conclusions based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating"); *LinkCo, Inc. v. Fujitsu, Ltd.*, 2002 U.S. Dist. LEXIS 12975, No. 00 Civ. 7242 (SAS), at *6-7 (S.D.N.Y. July 16, 2002) (excluding proposed expert opinion that defendant had misappropriated trade secrets that belonged to the plaintiff).

In each of these respects it is the duty of the Court to police expert testimony in order to ensure that the subject matter of the testimony involves areas of special expertise that would actually assist the jury, and to prevent the admission of opinions that do not involve or require expertise but that instead merely tell the jury what result to reach. Fed. R. Evid. 702 (Advisory Committee Note); *U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.") (emphasis in original).

8

The trial court also has a duty to ensure that proffered expert testimony is the product of the application of reliable principles and methods. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This requires the Court to make a preliminary assessment of whether the proposed testimony is reliable and based on sound reasoning or methodology. *Id.* The Court's "gatekeeping" function is not limited to scientific testimony, but extends as well to testimony based on technical or specialized knowledge. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The trial court must ensure that proposed expert testimony reflects "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

As explained below, some of Mr. Alexander's proposed testimony is improper and/or unreliable and the Court therefore recommends that it be excluded under the foregoing standards.

## A.    HHSH's Alleged Insolvency

Mr. Alexander was asked to review HHSH's financial performance. He proposes to testify as to his opinion that HHSH was not financially viable and instead was insolvent from its inception through the year 2016. To the extent that this testimony involves Mr. Alexander's review of financial statements and data and/or his computations based on that information, the proposed testimony is within the proper scope of expert testimony.

Defendants argue that HHSH's solvency should not be judged by ordinary definitions and instead that HHSH may not be treated as "insolvent" unless it failed specific actuarial tests under the governing regulations. *See* 11 N.Y. Comp. Codes R. & Regs. § 350.8. They further argue that Mr. Alexander should be precluded from applying (or testifying about) any other context in which "insolvency" might be calculated or might be relevant. However, the regulations cited by Defendants just describe the steps that an operator must take if the superintendent finds, based on

9

actuarial reports, that the facility is not in "satisfactory actuarial balance,"as that term is defined

in section 350.1 of the regulations.  The regulations state that a facility that is not in satisfactory

actuarial balance will be "deemed" to be insolvent if its plan to reach satisfactory actuarial

balance is not approved by the regulator, or if an approved plan nonetheless fails to project the

attainment of a satisfactory actual balance within certain regulatory time frames.  The regulations

do not purport to define when a continued retirement care community might be "insolvent" for

other purposes or under other legal or accounting standards.  "Insolvency" as that term is

traditionally defined — namely, a condition in which the fair value of the likely liabilities of

HHSH exceeded the fair value of HHSH's business and assets — is a financial condition that is

relevant to the ability of an entity to continue to function.  A jury could reasonably find that

information about "insolvency" in that traditional sense was material to residents and prospective

residents regardless of whether the facility was "deemed" to be insolvent under the regulations.

Defendants also argue that Mr. Alexander lacks the expertise to testify about the statutory

actuarial calculations that are contemplated by the foregoing regulations.  That part of the motion

is on solid ground with respect to other parts of Mr. Alexander's proposed testimony as

explained below, but his proposed testimony about HHSH's solvency does not appear to be

based on any particular actuarial calculations that he himself has prepared.

Defendants further argued at the hearing on the motion that Mr. Alexander's solvency

calculations are faulty because they are "balance sheet" calculations that are based solely on

asset liquidation values and not based on going concern values.  It is true that the solvency of an

ongoing business is normally measured by calculating the value of its ongoing business and the

revenues it is likely to generate, and not merely by comparing the present liquidation values (or

the book values for accounting purposes) of its existing assets and liabilities.  *See Peroff v.*

*Liddy, Sullivan, Galway, Begler & Peroff, P.C.,* 852 F.Supp. 239, 242 (S.D.N.Y. 1994);

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Serv. Co.,* 910 F.Supp. 913, 939

(S.D.N.Y. 1995), quoting *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1066–67 (3d Cir.

1992) and *In re Vadnais Lumber Supply, Inc.,* 100 B.R. 127, 131 (Bankr. D.Mass. 1989).  This is

because the main value of an operating business is to be found in the future revenues that the

business may generate, and not just in the assets it has already accumulated.  For that reason,

courts that have addressed claims in which a proof of insolvency is required (such as preference

claims and certain fraudulent transfer claims) have consistently frowned upon the use of

calculations that are based on liquidation values rather than going concern values, unless the

demise of a business is so clearly imminent that the business is incapable of generating any

further revenues.  *See, e.g.*, *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World

Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998) (value of a business should be computed on a

going concern basis unless the demise of the business is so clearly imminent that the business is

incapable of generating any ongoing revenues); *Moody*, 971 F.2d at 1067 (proper to use sale

values that presumed a going concern unless bankruptcy was "clearly imminent"); *In re Taxman

Clothing Co.*, 905 F.2d 166, 169-70 (7th Cir. 1990) (going concern valuation should be used

unless the "business is on its deathbed"); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais

Lumber Supply, Inc.)*, 100 B.R. 127, 131 (Bankr. D. Mass. 1989) (holding that solvency is to be

measured by the going concern value of a business and "not the liquidation value of its assets

less its liabilities" unless "the business is so close to shutting its doors that a going concern

standard is unrealistic"); *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd.)*,

93 B.R. 333, 341 (E.D. Pa. 1988) (going concern values should be used unless company is "on

its deathbed"); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 111

(Bankr. S.D.N.Y. 1999) *aff'd sub nom*, *Jackson v. Mishkin*, 263 B.R. 406, quoting *Briden v.*

*Foley*, 776 F.2d 379 (1st Cir. 1985) ("unless a business is on its deathbed ... the fair value of its

assets ... is the going concern value or fair market price").

While the Defendants appear to be right about the proper way to do solvency

calculations, however, they did not move to exclude Mr. Alexander's calculations on this basis.

If Defendants believe the calculations use an improper approach they may object at trial, but the

issue was not fairly raised or briefed in connection with the motions *in limine* that are presently

before the Court, and so it would not be proper to rule on the question at this time.

### B.    HHSH's Actuarial Reserves

Mr. Alexander proposes to testify that HHSH was unable to meet its minimum actuarial

reserve requirements.  However, to the extent that Mr. Alexander purports to testify as to what

HHSH's minimum actuarial reserve requirements actually were, there is no indication in the

record that he has the expertise to do so.  In addition, to the extent that his testimony as to

whether HHSH complied with actuarial reserve requirements is simply a recitation of what other

evidence shows (and not the result of a computation that he himself has done or of an

interpretation of financial data that requires expert interpretation), that testimony is not proper

expert testimony.

Mr. Alexander also proposes to testify that an examination by the New York State

Department of Insurance allegedly showed that HHSH's actuarial surplus was impaired, and that

HHSH operated under a Plan of Restoration and did not have enough capital to satisfy its long-

term liabilities.  Similarly, he proposes to testify that the auditors of HHSH issued "going

concern qualifications" upon some of their reviews of HHSH's financial statements.  It is not

clear how a recitation of these facts requires any expertise of any kind.  Instead, it appears that in

this regard Mr. Alexander would just serve as a narrative witness to summarize various evidence that is part of the Plan Administrator's case. That is not proper for the reasons set forth above.

### C.    Opinions as to Alleged Deficiencies in Defendants' Disclosures

To the extent that Mr. Alexander, based on his financial analysis, has computed figures that differ from those that were included in a disclosure statement, he may testify about his calculations. Counsel may then make arguments to the jury as to whether the disclosure statements were in error or were incomplete.

However, Mr. Alexander has also been asked to the review the disclosure statements that HHSH gave to residents and to prospective residents and generally to state his own conclusions as to whether the disclosure statements omitted material facts or contained untrue or misleading statements of fact. There are several problems with this proposed testimony.

First, to the extent that the testimony would involve a comparison between what the disclosure statements say and what other evidence shows, the jury is capable of doing that comparison (guided by counsel in closing argument). The jury does not need an expert to guide it through the process, and an expert should not be used to make arguments and summations that are properly made by counsel.

Second, to the extent this proposed testimony involves Mr. Alexander's opinions on the ultimate legal questions to be resolved by the jury, it is not proper. *United States v. Scop*, 846 F.2d at 139-40 (1988) (holding that expert's testimony that the defendants had engaged in a manipulative and fraudulent scheme within the meaning of the securities laws was not within the permissible scope of expert testimony and was prejudicial); *S.E.C. v. U.S. Envtl., Inc.* 2002 WL 31323832, at *4 (holding that an expert may make factual conclusions based on matters that reflect special expertise but that "the expert cannot give testimony stating ultimate legal conclusions based upon those facts, nor can that testimony track the language of the statute or the

law that the defendants are accused of violating.")  This portion of Mr. Alexander's testimony is just a thinly-disguised argument of the Plan Administrator's case rather than a legitimate offer of expert testimony.

Mr. Alexander also proposes to testify as to his opinion about whether particular information would have been "material" to residents and to prospective residents.  This, too, is not proper.  The Plan Administrator argued that CPAs must make decisions as to whether information is "material" in compiling financial statements, but corporate executives and many other people must make similar decisions.  The fact that Mr. Alexander must make such judgments from time to time does not mean that he is an expert in doing so.  Furthermore, Mr. Alexander's status as a CPA does not qualify him as an expert in defining what information a resident or a prospective resident in a continued care retirement facility would reasonably want to know.  Most importantly: the standard that should govern the jury's determination of what is "material" is a legal standard to be defined by the court's instructions to the jury.

Finally, Mr. Alexander proposes to testify that in his opinion the Defendants' disclosures were not in compliance with New York regulatory requirements.  Mr. Alexander is not an expert in New York regulations that are applicable to continued care retirement communities and his personal conclusions about HHSH's compliance with regulations are not matters that are within the proper scope of expert witness testimony.  Any issue as to what those regulations legally require should be the subject of jury instructions rather than testimony by Mr. Alexander.

### D.    Opinions about what Defendants Knew or Should Have Known

Mr. Alexander has been asked to opine as to "when management of HHSH knew or should have known that their business model for operating the Westchester Meadows facility was not feasible."  This is entirely beyond the proper scope of expert testimony.  Mr. Alexander may testify as to his opinion as to what the true financial condition of Westchester Meadows

was.  Testimony about what Defendants actually "knew" or "should have known" are ultimate

questions for the jury to decide based on other evidence, however.  *Taylor v. Evans*, 1997 U.S.

Dist LEXIS 3907 at *2; *Lippe v. Bairnco*, 288 B.R. at 688.

###    E.    <u>Damages Purportedly Suffered by HHSH</u>

Mr. Alexander proposes to testify that the Defendants' actions caused damages to HHSH

in the amount of $18.15 million.  He bases this opinion on his contention that Westchester

Meadows could and should have been sold in 2012 and that the loss in value of the enterprise

when it was sold during HHSH's bankruptcy case was $18.15 million less than its value in 2012.

His proposed testimony as to the value of the facility in 2012 is based on sales statistics

published annually by Irving Levin Associates in its Senior Care Acquisition Reports.  Each of

those Senior Care Acquisition Reports summarizes the average "per bed" price of nursing

facilities that were actually sold in various years and in various regions.  For calculation purposes

Mr. Alexander picked the "per bed" sale price for the New England region for the year 2012.

The figures that are reported in the Irving Levin Associates reports are based entirely on

the average prices of facilities that happened to be sold during a given year.  Facilities obviously

may differ widely in quality, age, staffing, amenities, the nature of services provided and in their

financial condition, but there is nothing in the Irving Levin Associates reports, or in Mr.

Alexander's report, that purports to show that the New England facilities that were sold in 2012

were actually comparable to Westchester Meadows in any of these respects.  Nor is there any

suggestion that the number of sales that occurred was statistically significant.  Most importantly:

there is nothing in the data that supports Mr. Alexander's conclusion that the annual changes in

"per bed" sales prices reflected actual changes in the market values of all such facilities.  For

example, the 2012 figure ($85,700 per bed) was 41.65% higher than the 2011 figure ($60,500

per bed), but there is nothing in Mr. Alexander's report (or in the portions of the Irving Levin

Associates reports that were submitted with it) that would explain why this dramatic change

reflected real changes in the overall market values of similar facilities, as opposed to just being a

random fluctuation that was attributable to the fact that different facilities were sold in different

years.

A trial court must make a preliminary assessment of whether an expert's proposed

testimony is reliable, which requires the court to consider whether (1) the testimony is grounded

on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

(3) the witness has applied the principles and methods reliably to the facts of the case.  *United

States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *Amorgianos v. Nat'l R.R. Passenger Corp.*,

303 F.3d 256, 265 (2d Cir. 2002).  In this instance, the proposed methodology is so flawed and

unreliable that the calculations and related testimony need to be excluded.  Information about

other sales is properly used only if there is also evidence that the items that were sold actually are

comparable to the item whose value is being measured.  *See, e.g., Washington v. Kellwood Co.*,

2016 U.S. Dist. LEXIS 136612, at *3 (S.D.N.Y. Sept. 30, 2016) (noting the exclusion of an

expert's proposed testimony about sales of other businesses because those other businesses were

not comparable to the one at issue); *Lippe v. Bairnco Corp.*, 99 F.App'x 274, 279 (2d Cir. 2004)

(affirming decision to exclude comparative sales valuation testimony, in part, because of the

expert's failure to verify that the compared-to companies "were indeed comparable" to the

subject company and to adjust her analyses to account for variances); *In re Med Diversified, Inc.*,

346 B.R. 621, 642 (Bankr. E.D.N.Y.,2006) (disqualifying comparative sales valuation testimony,

in part, because the witness's compared-to transactions were not comparable to the transaction to

be valued.).  For example, one could not use the average "per bedroom" sales price for all

apartments sold in New York City during a given year (including Manhattan) as a reliable means of determining the actual value of a two-bedroom apartment in a depressed outer-borough neighborhood.  Unless properties are comparable, information about other sales is a meaningless and misleading way to assess value.

After the Court made its initial rulings on this subject the Plan Administrator filed a motion seeking permission to amend Mr. Alexander's report (the "Motion to Amend").  The proposed amendments were not submitted with the motion, but at the hearing the Plan Administrator suggested that Mr. Alexander planned to identify particular facilities that had been sold in 2012 and that were comparable to the Westchester Meadows facility.  The Plan Administrator also asked that Mr. Alexander be permitted to file this updated analysis on or before 14 days after the Court permitted the filing of a supplemental report and suggested that the Defendants then be permitted additional time to file rebuttal reports and to take additional discovery as to the proposed comparable transactions.

It should be noted that the original scheduling order in this matter required that all discovery be completed by January 31, 2019.  [ECF No. 24.]  The first amended scheduling order permitted expert reports to be filed by March 22, 2019 and required expert discovery to be finished by June 14, 2019.  [ECF No. 44.]  Those deadlines were extended two more times by agreement of the parties [ECF Nos. 57 and 62], with the final expectation that all expert reports would be exchanged no later than June 28, 2019 and that expert depositions would take place during the period July 9 through July 12, 2019.  During this process, Mr. Alexander submitted a report on April 19, 2019 that was reissued on May 16, 2019 to add previously missing citations and reference materials and to revise certain calculations.  Defendants' expert witness, Pamela O'Neill, submitted a rebuttal expert report on June 14, 2019 that argued (among other things)

17

that Mr. Alexander had failed to show that the figures set forth in the Irving Levin Associates

reports were based on facilities that were comparable to Westchester Meadows.  *See* Expert

Report of Pamela M. O'Neill, submitted as Exhibit Q to the Declaration of Claire M. Hankin-

Wray [ECF No. 86]  ¶¶ 27-33.  Mr. Alexander then submitted a supplemental report on June 28,

2019, but in doing so he elected to adhere to the figures in his prior report and chose not to

identify any comparable transactions.

      The Plan Administrator has not suggested that Mr. Alexander lacked the necessary time,

information or resources to identify an appropriate set of comparable sales and to designate them

within the times that were prescribed for the submission of the original expert reports.  Nor has

the Plan Administrator argued that he lacked notice of the Defendants' criticism of Mr.

Alexander's report, or that Mr. Alexander lacked the time to identify comparable sales once the

Defendants had lodged their criticisms.

      Defendants have opposed the Plan Administrator's request.  They argue that Mr.

Alexander had sufficient time to do the necessary work and to identify an appropriate set of

comparable transactions during the time provided under the Court's prior Scheduling Orders, and

that discovery should not be re-opened just because Mr. Alexander (and the Plan Administrator)

elected not to do a reliable calculation.  They also argue that the Defendants would be prejudiced

if the motion were to be granted because the trial would be delayed, additional discovery

expenses would be incurred, and Defendants would potentially be forced to engage a rebuttal

expert and to pay the expenses of analyzing the purported "comparable" transactions.  I agree.

*Daubert* and other decisions have put parties and experts on fair notice that they are expected to

perform reliable studies and to prepare reliable reports, and also that there are consequences if

they fail to do so.  If parties and their retained experts nevertheless elect to use unreliable

methods and to forego proper analyses in preparing damage estimates, they should be held to

account for those decisions.  Giving parties a "do-over" if and when their reports are found to be

unreliable would just encourage parties and experts to cut corners and to submit sub-standard

work in the first go-round.  It would also force innocent adversaries to incur additional and

unnecessary expense and inconvenience.  *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 386

(S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004), and cases cited therein.  I therefore

recommend that the Plan Administrator's motion be denied insofar as it relates to the

identification of purported comparable transactions in connection with the damages allegedly

suffered by HHSH.

## F.    Damages Allegedly Owed to Residents

Some residents assigned their claims to the Plan Administrator, as noted above.  Section

4618 of the New York Public Health Law provides that any person who delivers a disclosure

statement or annual report that omits a material fact or makes an untrue or misleading statement

of material fact

> . . . shall be liable to the individual contracting for services pursuant to such
> contract for damages and repayment of all entrance, application, periodic charge,
> or other fees paid by such person, less the reasonable cost of care and housing
> provided until discovery of the violation or until the violation should reasonably
> have been discovered, together with interest, costs, and reasonable attorney's fees.

N.Y. Pub. Health § 4618.

Mr. Alexander has proposed to offer his calculations of the damages to which the

assignors would be entitled under section 4618.  However, the statute plainly requires an offset

for "the reasonable cost of care and housing" that was actually provided.  The Plan Administrator

has not purported to calculate such values, and Mr. Alexander has not done so.

In his original report, Mr. Alexander stated that at the Plan Administrator's request he had only calculated the entrance fee refunds and accrued interest to which the assignors might have been entitled, to the exclusion of "other categories of damages sustained by the Assignors or costs or reasonable attorney's fees." *See* Expert Witness Report, submitted as Exhibit A to the Declaration of Claire Hankin-Wray [ECF No. 86] at 21. Ms. O'Neill then argued in her rebuttal report that the calculations were inadequate because they failed to address all of the items that must be addressed under the statute. *See* Expert Report of Pamela M. O'Neill, submitted as Exhibit Q to the Declaration of Claire M. Hankin-Wray [ECF No. 86] ¶ 16. Mr. Alexander then argued in his Supplemental Report that in fact he had properly analyzed the reasonable costs of care in his original calculations, but that he had determined that they were inconsequential to his damages calculations because HHSH's periodic charges were based on "competitive fees charged in the marketplace" and that such competitive fees should have been equivalent to the reasonable costs of housing and care. *See* Supplemental Expert Report of AEA Group, LLC, submitted as Exhibit C to the Declaration of Claire M. Hankin-Wray [ECF No. 86] ¶ 10; Dep. of Julian Lester Alexander III, submitted as Exhibit 21 to the Declaration of David J. Stone [ECF No. 100], at 256-57.

The Court initially ruled at the August 21 hearing that Mr. Alexander's calculations were improper in three respects. First, it appeared (based on the Plan Administrator's submissions and Mr. Alexander's reports) that Mr. Alexander's calculations did not take account of the costs of both care and housing, as the statute requires. Second, it appeared that Mr. Alexander had simply assumed that the fees charges by HHSH were equal to the actual costs of housing and care, without any supporting analysis to determine if that were actually the case. Third, the Court noted that different residents likely had different needs and received differing amounts of

care, and that Mr. Alexander had not proposed any individualized calculations based on the care and housing that each resident actually received.

After the Court's initial ruling, the Plan Administrator filed the Motion to Amend. The Plan Administrator proposed that Mr. Alexander would analyze actual cost information that HHSH had provided and would compile an analysis of how that cost information compared to the fees that HHSH collected. The analysis was not submitted with the Motion to Amend, but as with other proposed amendments the Plan Administrator proposed a schedule under which the amendments to the report would be served and under which the Defendants would be permitted additional time to designate rebuttal expert testimony and to do additional discovery.

The Court recommends that the motion be denied insofar as it relates to the Plan Administrator's proposal to submit a "new" analysis of the cost data. The Plan Administrator, and Mr. Alexander, had sufficient time to do these analyses under the original discovery schedule. They should not be allowed to re-open discovery (and to force Defendants to face additional delays and expense) to do work that could and should have been done earlier.

On the other hand, consideration of the Motion to Amend (and of the Defendants' response) has convinced the Court that it would be premature to exclude Mr. Alexander's testimony regarding the costs of housing and care that residents received. It was clear from the argument of the Motion to Amend that the Defendants have offered no "cost" calculations of their own and that Defendants have not put forth any evidence that they actually incurred "costs" in providing housing and care that exceeded the amounts that they charged for those services. In addition, this Court does not know what evidence will be offered as to how HHSH's housing and care fees were calculated. It is conceivable that the evidence might show that the approved fees were calculated in such a way as to ensure that they would cover (or even exceed) the associated

costs.  The Plan Administrator has also argued that charges related to the care of individual

residents were standardized and were analogous to insurance premiums, and so the question of

whether those charges were equivalent to the reasonable costs of care should be decided based

on whether the "premiums" were reasonable in light of the care that was available when needed.

Once again, this Court does not have a good sense of what evidence might be offered on this

point.

      The purpose of an *in limine* motion is to allow a trial court to make evidentiary rulings

without interruption to the trial itself.  *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp.

2d 461, 467 (S.D.N.Y. 2005) (quoting *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir. 1996)).

However, "evidence should be excluded on a motion in limine only when the evidence is clearly

inadmissible on all potential grounds."  *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09

CIV. 3255, 2012 WL 2568972, at *2 (S.D.N.Y. July 3, 2012) (internal quotation marks and

citations omitted).  Where further clarity is needed, the Court may reserve judgment on the

motion until the appropriate factual context is developed at trial.  *Nat'l Union Fire Ins. Co. of

Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).  While this

Court is skeptical as to the calculations offered by Mr. Alexander and as to the reasonableness of

the assumptions that he made for the reasons set forth on August 21, the Court believes that a

final decision as to the admissibility of this testimony should be made at trial and in the context

of what other evidence might show.  The Court therefore recommends that the trial court defer a

decision as to the admissibility of Mr. Alexander's calculation of damages allegedly owed to

residents until trial.

### G.    Testimony about the Dates on Which Damages Should be Calculated

The statute also requires a calculation of damages up to the date on which a resident

discovered or should have discovered the relevant violation.  Mr. Alexander proposes to testify

as to his opinions as to when residents actually knew or should have known about their claims,

but these are not proper matters of expert testimony.  What residents actually knew must be the

subject of actual testimony by people with real knowledge.  Arguments as to what they should

have known, and when they should have known it, should be made by counsel, not by Mr.

Alexander.

In addition, Defendants are correct in noting that the jury must be free to make its own

conclusions as to when residents knew or should have known of the violations claimed by the

Plan Administrator.  As a result, any calculations that Mr. Alexander provides must be presented

in a way that will allow the jury to identify the damages that would be owed to each resident

depending on the date that the jury selects as the one on which the statutory calculation must be

made.

### H.    Other Issues Regarding Damage Calculations

During the August 21 hearing, counsel to Defendants argued that some residents who

hoped that Bethel would purchase Westchester Meadows had offered to modify their contracts in

order to make a repayment of their entrance fees contingent on Bethel's financial performance.

However, no party has sought any pretrial ruling as to whether such offers were made and

accepted or as to the possible effect that a modified contract under those circumstances might

have on a resident's damage claims against the Defendants.  Any issue in that regard will need to

be addressed by the District Court at trial.

Similarly, the Court noted at the hearing that the statute appears to contemplate a "rescissionary" measure of damages, in which prior amounts paid will be refunded but with a deduction for the value of services actually provided. It is not clear if damages still are available under the statute (or how such damages would be calculated) in the case of residents who learned of a problem and who did not seek rescission and who instead elected to continue to occupy their units. Neither party made any pretrial motion on this issue and so presumably it will have to be addressed by the trial court in the context of jury instructions.

### III.    Defendants' Motion to Exclude References to Ponzi or Pyramid Schemes

The approved model for the operation of a continued care retirement facility includes an up-front payment and in some (but not all) cases a right to a refund of some or all of that payment at the time a resident dies or leaves a facility. Defendants contend that during pretrial discovery the Plan Administrator's counsel has referred to this business model as a "Ponzi" scheme or as a "pyramid" scheme. Those characterizations should be excluded at trial. CCRC facilities and their associated financing structures – whatever one thinks of them – are legal structures that are approved by the State of New York and by many other States. By contrast, a Ponzi scheme, or a pyramid scheme, is an inherently illegal enterprise. Equating a CCRC with an inherently illegal enterprise would be inflammatory and prejudicial.

The Plan Administrator stated during the hearing, however, that a document was produced during discovery that included a remark that likened the CCRC business model to a Ponzi scheme. The Court does not know whether that document will be admissible at trial or for what purpose. If it is admissible, however, the Plan Administrator should be entitled to question the author as to why the author used that particular term and what the author intended by it.

IV.    **Plaintiff's Motion to Exclude Evidence of Regulatory Approvals**

The Plan Administrator argues that as a matter of law the mere fact that the Defendants submitted their disclosure statements to New York State officials in advance does not mean that the underlying disclosures necessarily complied with the statute and does not shield Defendants from potential liability.  This legal proposition seems correct.  The statute addresses liability for misleading statements and omissions; it is not limited to matters for which State officials ordered clarification or further disclosure.

However, Defendants disclaim any argument that the submission of the disclosures to regulators (or approval by those regulators) would shield Defendants from liability.  Instead, they argue that they attempted to comply with their disclosure obligations and believed that they had done so, and that evidence of their dealings with regulators is evidence of their good faith effort to make proper disclosures.  Scienter and intent are elements of at least some of the claims that have been asserted and the evidence is relevant for that purpose.

In addition, the Third Amended Complaint accuses Defendants of violating New York's disclosure regulations, of marketing the facility in violation of New York law, and of failing to address criticisms and deficiencies that were noted by regulators.  The Plan Administrator would like to tell a one-sided story in which he is free to tell the jury about the Defendants' negative dealings with regulators, but in which any other dealings with regulators and evidence of regulatory compliance are off-limits.  That is not appropriate.  The Defendants are accused of breaches of fiduciary duty by failing to comply with regulatory disclosure and operational requirements, and so evidence that the Defendants attempted to comply with the applicable regulations is material to their defense and is properly admitted.  To the extent that the Plan Administrator believes that the jury should be instructed that the regulators' approval of

25

disclosure statements does not shield the Defendants from liability, that is a matter to be

addressed with the trial judge when jury instructions are proposed.

## V.    Plaintiff's Motion to Exclude Alleged "Collateral Source" Benefits

HHSH sold the Westchester Meadows facility to Bethel in a transaction that was

approved by this Court.  One of the terms of the sale is that Bethel has agreed to repay the

refundable entrance fees that are owed to residents, but only to the extent that the operating

results of the facility are good enough to permit such payments.  Defendants argue that the

potential or likely payments by Bethel should be considered in measuring any damage claims

that residents have asserted, and as offsets to any such claim.

The Plan Administrator contends that payments by Bethel would be from a "collateral

source" and therefore that evidence about them should be excluded as a matter of law.  Questions

as to the applicability of the collateral source rule to the particular damage claims that have been

asserted in this case have not been fully briefed by the parties, but it does not matter, because the

court concludes that the "collateral source" rule (even if applicable) would not cover the

particular payments at issue.   The collateral source rule provides that damages are not

diminished by the fact that the injured party has been wholly or partly indemnified for his loss by

his own insurance or from other sources "to the procurement of which the wrongdoer did not

contribute."  *Healy v. Rennert*, 9 N.Y.2d 202, 206 (1961).  The "collateral source" rule does not

apply where, as here, it is the alleged wrongdoer (not the purported victim) who has made other

arrangements that may satisfy an obligation.  *See Ventura Assocs. v. Int'l Outsourcing Servs.*,

2009 U.S. Dist. LEXIS 21541 *6 (S.D.N.Y. Mar. 16, 2009) (describing the ordinary rule that

excludes evidence of insurance recoveries as covering instances in which plaintiffs have received

funds "from sources wholly independent of and collateral to the wrongdoer").

Bethel, which is the purported "collateral source," is not someone wholly independent of the alleged wrongdoer (HHSH).  Instead, Bethel is the successor owner of the facility, and the successor (by contract) to HHSH's liability to repay entrance fees, though the obligation that Bethel assumed is qualified based on Bethel's own financial results.  Furthermore, Bethel's obligations are the product of a contract between HHSH (the alleged wrongdoer) and the successor owner.  The fact that HHSH secured that obligation from Bethel and made contingent arrangements for the possible payment of entrance fee refunds was one of the factors that the Court considered in approving the proposed sale to Bethel as opposed to another party.

The Plan Administrator also argues that the remedy for some of the asserted claims is specified by Section 4618 of the New York Public Health Law and that any refund that Bethel may make is not properly offset against the "refund" that residents may claim from HHSH and the Defendants.  For purposes of the motion *in limine* it suffices to note that the statutory claims under section 4618 are not the only claims asserted by the Plan Administrator and that the evidence admittedly is relevant to the computation of damages on the common law and other claims.

The parties have each made arguments about the meaning and scope of section 4545 of the New York Civil Practice Law and Rules, which applies to actions to recover damages for "personal injury, injury to property or wrongful death" and that permits consideration by the court of evidence that medical costs or other economic loss "was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source, except for life insurance and those payments as to which there is a statutory right of reimbursement."  *See* N.Y.C.P.L.R. § 4545(a).  Whether section 4545 is a rule of substantive or procedural law, and whether the damages sought in this action represent damages for "injury to property," are open to

debate.  Even if section 4545 were to apply, however, it would only permit evidence to be considered by a trial court "after the rendering of the jury's verdict."  It has no application to the evidence to be considered by the jury at trial.

Finally, the Plan Administrator has argued generally that evidence about potential payments by Bethel is inherently too uncertain and speculative to be permitted.  On the one hand, if Bethel is not likely to pay anything then it would be improper to treat mere existence of Bethel's contingent obligation as a full offset to whatever liabilities the Defendants have.  On the other hand, however, the mere fact that the amounts of Bethel's potential payments cannot be forecasted with absolute mathematical certainty is not enough, by itself, to make them so speculative as to preclude evidence about them.  The Plan Administrator has not identified or challenged any particular evidence on this issue.  Whether Bethel is likely to make payments needs to be proved at trial, and if Defendants can show through competent evidence that Bethel is likely to fulfill some or all of that obligation they should be permitted to do so.

Dated: New York, New York
       November 15, 2019

                            **s/Michael E. Wiles**            
                            HONORABLE MICHAEL E. WILES
                            UNITED STATES BANKRUPTCY JUDGE